

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

WILLIAM C. BOND
P.O. Box 4823                                          *
Baltimore, Maryland 21211,

                                                       *

        Plaintiff *pro se*,

                                                       *        Civil Action No.:   JFM 16 CV 2723

    v.

JOHNNY L. HUGHES
United States Marshal
United States Marshals Service
District of Maryland
101 West Lombard Street
Baltimore, Maryland 21201,

       and

KEVIN PERKINS
Special Agent in Charge
Federal Bureau of Investigation
Baltimore Field Office
2600 Lord Baltimore Dr.
Windsor Mill, MD 21244,

       and

ROD J. ROSENSTEIN
United States Attorney
Office of the United States Attorney
District of Maryland
36 S. Charles St., Fourth Floor
Baltimore, MD 21201,

       and

"UNKNOWN NAMED MARYLAND U.S. JUDGES"

c/o The Hon. Catherine C. Blake
Chief Judge
United States District Court
District of Maryland
101 West Lombard Street
Baltimore, Maryland 21201,

                            *

      Defendants.

                            *

*    *    *    *    *    *    *    *    *

## INTRODUCTION

> The reporter slowed the small speedboat, then cut the engine off. We were about a mile out from Baltimore's Inner harbor, where the big cargo ships dropped anchor in the Patapsco River. The early fall 2010 day was sunny, yet windy, the crisp sort of day where shorts and a long sleeve polo over a T-shirt felt just right. The reporter pulled out some beers and chips from a cooler, "Cheers!" He said. "Now, tell me all about this meeting you had with the Fourth Circuit judge."

> "Sure," I answered, as the boat bobbed up and down in small waves. "But, first, can you tell me why we're meeting in the midst of hundreds of thousands of people in the middle of the Fell's Point Fun Festival, and why we're talking way out here in the middle of the harbor?"

> "I wanted to see who's following you – and make sure that no one can listen in on what we say . . . "

## COMPLAINT WITH DEMAND FOR JURY TRIAL

Comes now plaintiff, William C. Bond, *pro se*, (hereinafter "Plaintiff") and brings this lawsuit

against the United States Marshal for the District of Maryland, his office & officers; the Special

Agent in Charge of the United States Federal Bureau of Investigation for the District of

Maryland, his office & officers; the United States Attorney for the District of Maryland, his

office & officers; and the "Unknown Named Maryland U.S. Judges" of the United States District Court for the District of Maryland,' including any residing Maryland U.S. circuit judges; all acting in their 'individual capacities' (hereinafter "Defendants").

This is a civil action for civil rights relief alleging long-standing misconduct regarding the misuse of the U.S. Marshals Service and the FBI, acting 'under the color of law,' at the direction of rogue Maryland Article III judges and the Maryland U.S. Attorney's Office, to violate plaintiff's First Amendment & due process rights – all to cover up criminal & ethical judicial misconduct, obstruction of justice, and systemic 'fraud upon the court' perpetrated against plaintiff by the defendants.

Plaintiff brings this action under <u>Bivens v. Six Unknown Named Agents</u>, 403 U.S. 388 (1971), the First Amendment & due process clauses of the U.S. Constitution, and any other applicable laws or rules.

**JURISDICTION AND VENUE**

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. 1331.

Venue is proper in this Court pursuant to 28 U.S.C. 1391.

**FACTS**

1. Plaintiff is the only known *pro se* litigant in U.S. jurisprudence history whom the U.S. DOJ has ever joined to unseal one of their own criminal cases.[1]

2. This 'Bromwell' action received much attention, both locally in Maryland, and nationally via the *Associated Press*, in 2009-2010.[2]

3. Nevertheless, the district court denied plaintiff his constitutional rights re: standing, then the Fourth Circuit remained mute as to the blatant deprivation of plaintiff's constitutional rights.

4. Later, on the telephone, the Maryland U.S. Attorney's Office (hereinafter "USAO MD") told plaintiff they would not do anything further to champion plaintiff's civil rights deprivation battle, as they had been thoroughly chastised by the Maryland-based federal judges.

5. Disputing that, and wishing to know exactly why he was being targeted & treated 'differently' than other litigants, plaintiff arranged to be 'invited' to meet with the sitting U.S. Fourth Circuit judge who had been leading the denial of his civil rights since 2001.[3]

---

[1] Please see: U.S. v. Thomas L. Bromwell, Sr., et al., 05-cr-00358-JFM (D. Md.) & CA 4 no.: 09-7572.

[2] Please see these two Maryland *Daily Record* news stories: (1) https://www.scribd.com/document/136425369/Federal-prosecutors-willing-to-unseal-more-Bromwell-docs-Maryland-Daily-Record-April-10-2009 & (2) https://www.scribd.com/document/136425931/Bromwell-documents-to-remain-sealed-Maryland-Daily-Record-July-17-2009

[3] Plaintiff later memorialized these summer 2010 meetings with the sitting U.S. Fourth Circuit judge 'in detail' in a 2014 post-judgment appellate action in the 'Bromwell' case with a 'Motion for the Circuit Court to Recuse and Transfer." Please see: CA 4 no.: 14-6017 at docket

6. Soon after those meetings, in fall 2010, plaintiff filed a federal lawsuit against the U.S. DOJ and others in the U.S. District Court for the District of Columbia alleging civil rights violations based completely upon his in-person meetings with the sitting Fourth Circuit judge.[4]

7. Yet, more than a year later in 2011, then D.D.C. Chief Judge Royce C. Lamberth denied all claims against the U.S. DOJ in a 34-page-long memorandum opinion that neglected in any way to analyze plaintiff's facts regarding his meetings with the subject Fourth Circuit judge.

8. In late summer 2012, after the D.C. court denied reconsideration, plaintiff came right back with these same 'judicial disability' facts and attacked the judgment in the 'Bromwell' case for a second time, this time without the help of the USAO MD.

9. Many special interests groups and news presses, such as the Reporter's Committee for Freedom of the Press, paid notice to this action and considered its merits.

10. Nevertheless, the 'Bromwell' judge denied any new analysis and threw the matter out of court.

---

nos.: 9 & 15. The primary document can also be viewed here:
https://www.scribd.com/doc/200277080/Bond-Motion-to-Recuse-and-Transfer

[4] The following news story about that lawsuit – which inspired the 'Introduction' to this complaint – also contains the 2010 D.C. federal lawsuit & an earlier 2007-8 SCOTUS petition for certiorari: http://www.citypaper.com/bcp-cms-1-1061490-migrated-story-cp-20101110-mobs-20101110-story.html

11. Fast forward to late 2013 & early 2014 – after plaintiff's first round of public courthouse protest were completed, as described below – plaintiff, still not giving in to provable judicial misconduct in the 'Bromwell' case, then took the matter back to the U.S. Fourth Circuit Court of Appeals, first under the Crime Victim's Rights Act, then by appeal.

12. Ironically, because the 'Bromwell' judge had denied plaintiff his 'constitutional' standing in 2009, he was therefore never in the 'case' to suffer any 'victimhood,' as the Fourth Circuit then opined, while ignoring all other issues relating to the underlying provable judicial misconduct allegations. The 2014 appeal, likewise, had its merits ignored by the court.

13. Moving back in time, from late 2012 to early 2013, many impartial legal & news observers were seeing clearly that plaintiff was the victim of persecution by the judicial establishment.[5]

14. Plaintiff then made detailed criminal & judicial complaints about these matters to the Chief Judge of the U.S. Fourth Circuit in late 2012 & early 2013, which the Chief Judge not only ignored, but also returned to plaintiff in a plain brown envelope.

15. Having had enough of the judicial imperturbability shown toward plaintiff's allegations re: the deprivation of his constitutional rights, plaintiff then decided to publicly protest the 'provable corruption' in the Maryland U.S. courthouse at the courthouse itself.

---

[5] In fact, a former AUSA MD told plaintiff on the telephone that he "thought the days of judges treating people the way plaintiff was being treated were long over."

16. Beginning in April 2013, plaintiff created a public relations campaign called 'Baltimore Corruption Wire.'

17. This campaign was supported by Facebook, Twitter, YouTube, Scribd, Change.org, & Fundrazr platforms.

18. The campaign was focused around an advertising slogan "Is the 'WHITE GUERRILLA FAMILY' running the Maryland federal court?"

19. This ad campaign slogan ran in print and web formats in Baltimore's *City Paper* during summer and fall 2013 to much notice.[6]

20. Plaintiff also wrote an Op-Ed for the *Baltimore Sun* detailing what had transpired in the 'Bromwell' case titled "CORRUPTION *Sub Curia.*"

21. When the Op-Ed was rejected over length concerns by the *Sun's* editors, plaintiff then made the Op-Ed the center of his anti-federal-court-corruption activities, as it explained in detail how

---

[6] The ads can be seen here: (1) https://www.scribd.com/doc/296483607/Corruption-Wire-web-ad & (2) https://www.scribd.com/doc/296483897/Corruption-Wire-print-ad

the Maryland federal court had become an upper class version of the notorious 'Black Guerrilla Family' prison gang.[7]

22. Needless to say, these activities attracted a lot of notice by Baltimore's close-knit legal elites.

23. Then, plaintiff announced a public protest schedule to begin August 4, 2013, at the Baltimore U.S. courthouse, and publicly solicited the same citizens who would later become the #BlackLivesMatter movement to join him to correct the provable corruption, and double standards for rich & poor, in the Maryland U.S. courthouse, as evidenced by the secret self-dealing which was provable fact in the 'Bromwell' case.

## COUNT I

24. The first knock on your door from government law-enforcers is something one never forgets.

25. On July 19, 2013, and July 30, 2013, plaintiff was visited at his then-apartment by one Deputy U.S. Marshal (hereinafter "DUSM") and by one FBI agent.

26. During the July 19, 2013, meeting, the federal agents wished to come inside plaintiff's residence to "talk." As they had no 'search warrant,' plaintiff declined that request, but he did agree to meet with the agents in a 'common room' of his then-apartment building.

---

[7] Please see the Op-Ed here: https://www.scribd.com/doc/136418039/William-Bond-CORRUPTION-Sub-Curia-op-ed.

27. The agents followed plaintiff to this 'common room' and acted, on guard, as if plaintiff was a violent criminal ready to attack them.

28. Oddly, the DUSM voiced several times how much he had been looking forward to meeting plaintiff.

29. The FBI agent, who led the questioning, peppered plaintiff with questions regarding the potential safety of various government officials and federal judges, some of whom were former neighbors of plaintiff, and one whose daughter used to babysit for plaintiff's stepchildren.[8]

30. Plaintiff made it clear to the agents that their line of questioning had no basis in fact, that it bordered on fantasy, and that plaintiff had made it clear his goal was to have certain judges removed from the federal bench by either impeachment or forced resignation.

31. Nevertheless, the FBI agent asked repeatedly what could be done to make the scheduled courthouse protests go away?

32. The second knock on your door from government law-enforcers provokes fear.

33. Why are they back?

---

[8] Plaintiff is 52-years-old. He has no, nor has he ever had, a criminal record. Nevertheless, plaintiff was later told by the DUSM that he was 'profiled' by FBI 'Profilers' and

34. Before plaintiff opened his then-apartment door on July 30, 2013, he asked the federal agents outside if they had a warrant, which they, again, did not have.

35. When plaintiff opened his then-apartment door – staying within the threshold, this is what he saw: Standing directly across from him was the same DUSM from the first visit, whom plaintiff would later learn was the Chief of the Maryland U.S. Marshals Service's Protective Intelligence Unit (hereinafter "USMS PIU"). To plaintiff's direct right, in a semi-ready-to-tackle-stance was a different FBI agent than from the first visit, whom plaintiff would later learn was the FBI's Supervisory Special Agent in charge of the Baltimore Field Office's 'Violent Crimes Unit.'

36. The federal agents demanded plaintiff's firearms, which plaintiff denied having.

37. The federal agents again requested to come inside plaintiff's then-apartment, which plaintiff denied them permission to do.

38. Plaintiff then agreed to go speak with the federal agents in the same 'common room' as before once plaintiff was repeatedly assured that the federal agents had no warrant to arrest plaintiff.

---

declared a 'dangerous sociopath' who presented 'grave' danger to U.S. government officials. Obviously, an impartial observer could view this analysis as self-serving rhetoric.

39. Again, plaintiff was followed to the 'common room' and treated again as if he were a violent criminal ready to commence mayhem with the non-existent 'gats' the law-enforcers sought.

40. The new FBI agent, whose code name was "Undertaker," led the questioning. Again, were any federal judges or government officials in any danger from plaintiff?

41. Where were plaintiff's guns? Where were plaintiff's guns? 1,000 times it was asked.

42. As all of plaintiff's firearms were confiscated in 2001 by the State of Maryland in a purported criminal action (charges dismissed, record expunged), plaintiff proffered that they should damn well know where the guns were.

43. Again, the FBI agent asked – holding some of plaintiff's 'White Guerrilla Family' promotional literature in his hand – "What would it take to make this [the planned demonstrations] go away?"

44. Plaintiff proffered to the FBI agent that the USAO MD was the one who should be asking that question and that plaintiff was happy to meet with them re: same.[9]

---

[9] Later, in fall 2013, the FBI agent would schedule, then cancel, a meeting between the FBI, the USMS, & the USAO MD, to be held, as a courtesy, in a major law firm's Baltimore conference room.

45. The FBI agent didn't like that answer, and stated that he was sent to interview plaintiff to gather certain information and that he had to report back immediately – to whom, he would not say.[10]

46. As the agents left, they asked for the name of plaintiff's ex-wife so as to confirm that she was in possession of firearms they believed plaintiff still possessed.

47. The USMS PIU manuals specifically speak about the unit being prohibited from using their resources to violate the First Amendment rights of citizens.

48. Clearly, the timing of these visits, especially the attempt to arrest plaintiff for illegal weapons possession, was intended with one goal and one goal only in mind: to prevent and/or to intimidate plaintiff's planned demonstrations at the Baltimore U.S. courthouse on August 4, 2013.

49. These intentional, knowing, bad-faith, and illegal acts by the defendants caused plaintiff great worry, anxiety, fear, sleeplessness, etc., amongst many other things, as it was clear to plaintiff that his enemies would stop at nothing to defeat his constitutional rights.

---

[10] On information and belief, the "Unknown Named Maryland U.S. Judges" were independently operating & controlling the subject government agents outside of the normal U.S. DOJ 'chain-of-command.'

50. Wherefore, for the aforementioned illegal conduct, plaintiff seeks $15,000,000 from the defendants for compensatory damages, and $30,000,000 from the defendants for punitive damages.

## COUNT II

51. A 'black lives matter' type activist contacted plaintiff on July 14, 2013, after plaintiff announced his U.S. courthouse demonstration schedule on Facebook.

52. This 'activist' claimed to be interested in plaintiff's 'Baltimore Corruption Wire' entity, and especially in plaintiff's planned U.S. courthouse demonstrations.

53. This 'activist' and plaintiff communicated via Facebook and on the telephone multiple times.

54. Of note, the 'activist' was offering to help with the planned protests, including by providing 'bodies' to protest, money for advertising, and grassroots help in the 'black' community so as to 'take down' the corrupt judges in the Maryland U.S. courthouse.

55. On July 20, 2013, the 'activist,' his 'wife,' and plaintiff met at a North Baltimore café for three (3) hours to discuss plaintiff's planned U.S. courthouse demonstrations.

56. The 'activist' and his 'wife' spent much time asking plaintiff, in great detail, about his life story, including attempting to solicit harmful intentions toward the subject U.S. judges.

57. The 'activist' and his 'wife' spent much time offering their time, help, money, grassroots organizing abilities, and, most importantly, 'bodies' to protest at the planned U.S. courthouse protests.

58. The 'activist' and his 'wife' guaranteed at least fifty (50) 'bodies' to protest, with as many as 'several hundred' to be added to that number.

59. There were many Facebook and telephone conversations with the 'activist' regarding the upcoming protests and what his contributions would be.

60. Nevertheless, when the first planned U.S. courthouse protest day arrived, the 'activist,' his 'wife,' his 'bodies,' nor any other support, were no where to found.

61. On information and belief, the 'activist' and his 'wife' were undercover U.S. government agents sent (1) with the clear intention to sabotage plaintiff's U.S. courthouse protests in any way possible and (2) to criminally entrap plaintiff by attempting to engage plaintiff in discussions of violence against federal officials, even though plaintiff has always insisted that the misbehaving Maryland federal judges should be held accountable, publicly, under the law and rules.

62. These intentional, knowing, bad-faith, and illegal acts by the defendants caused plaintiff great worry, anxiety, fear, sleeplessness, etc., amongst many other things, as it was clear to plaintiff that his enemies would stop at nothing to defeat his constitutional rights.

63. Wherefore, for the aforementioned illegal conduct, plaintiff seeks $15,000,000 from the defendants for compensatory damages, and $30,000,000 from the defendants for punitive damages.

## COUNT III

64. The protests began on August 4, 2013.

65. At first, they were planned only for once a month.

66. But, after the judge for whom the 'White Guerrilla Family' gang was named actually visited the protests to admire the protest signage he inspired, the protest schedule was moved to a mostly weekly event at the Baltimore U.S. courthouse though late fall 2013.

67. During these protests, plaintiff was always supervised by the DUSM PIU agent and also often by Federal Protection Service officers, sometimes in full SWAT gear.

68. Naturally, the DUSM and plaintiff became acquainted, especially as the DUSM had claimed he had long-wanted to meet plaintiff.

69. Soon, the DUSM came to see that plaintiff was no 'sociopath' as the U.S. DOJ profilers had attempted to 'mark' him, but as a "lover," not a "fighter" who just wanted to "go back to the country club."

70. Plaintiff and the DUSM spent much time chatting at the U.S. courthouse during plaintiff's demonstrations.[11]

71. Plaintiff also learned, while chatting with federal law-enforcers during his protests, that the 'judges' were misusing the U.S. Marshal's indoor courthouse gun range.[12]

72. Several times the DUSM explained that the reason he had always wanted to meet plaintiff was because of his particular letter writing abilities, letters which acted as 'prosecutions' of certain 'judges' and other government officials.

73. When plaintiff queried how long this desire had existed, the DUSM explained that he had been surveilling plaintiff since 2010, since his D.C. lawsuit was filed against the Maryland U.S. Attorney.

---

[11] The DUSM was convinced (as the government's 'expert' on plaintiff) that plaintiff was in the "right" and that he had "gotten f**ked-over by the 'judges,'" which was a statement he made many times.

[12] This information became a qui tam lawsuit. Please see: 15-cv-00199-DAF (D. Md.)

74. Frankly, this revelation surprised plaintiff very much, as he had thought the reporter's precautions in 2010, as 'suggested' in the introduction to this lawsuit were a joke.

75. It is a clear due process violation for a government entity to spy upon a citizen who is suing the government.

76. This act is also a violation of the rules of court, which government attorneys must also follow.

77. These intentional, knowing, bad-faith, and illegal acts by the defendants caused plaintiff great worry, anxiety, fear, sleeplessness, etc., amongst many other things, as it was clear to plaintiff that his enemies would stop at nothing to defeat his constitutional rights.

78. Wherefore, for the aforementioned illegal conduct, plaintiff seeks $15,000,000 from the defendants for compensatory damages, and $30,000,000 from the defendants for punitive damages.

**COUNT IV**

79. The DUSM also told plaintiff about how his surveillance of plaintiff continued in 2012, after plaintiff had lost his home, his dog, all his possessions, etc., and was living in an unelectrified 'squat' in a derelict building.[13]

80. As this surveillance came as plaintiff was attacking the 'Bromwell' case the second time in summer 2012, clearly the intention by the government was the unconstitutional deprivation of plaintiff's due process and civil rights.

81. On information and belief, this continued surveillance, which, as already stated, began in 2010, and has, on information and belief, continued until this day, has consisted of electronic monitoring of plaintiff's communications, including telephone and internet communications, all with the intention of interfering with plaintiff's public protests and his public policy legal activities, including lawsuits against government actors.

82. These intentional, knowing, bad-faith, and illegal acts by the defendants caused plaintiff great worry, anxiety, fear, sleeplessness, etc., amongst many other things, as it was clear to plaintiff that his enemies would stop at nothing to defeat his constitutional rights.

83. Wherefore, for the aforementioned illegal conduct, plaintiff seeks $15,000,000 from the defendants for compensatory damages, and $30,000,000 from the defendants for punitive damages.

---

[13] Plaintiff's then & present negative financial situation was & is the direct & intended

**COUNT V**

84. On September 29, 2015, while visiting the Baltimore U.S. courthouse, plaintiff was subjected to an effort by the DUSM to invade his *pro se* litigant work product in the qui tam case mentioned above, in violation of the rules of court.

85. That same day and time, plaintiff was also subjected to an effort by the DUSM, working in tandem with the U.S. judge who was the model for the 'White Guerrilla Family' ad campaign, to criminally entrap plaintiff.[14]

86. These intentional, knowing, bad-faith, and illegal acts by the defendants caused plaintiff great worry, anxiety, fear, sleeplessness, etc., amongst many other things, as it was clear to plaintiff that his enemies would stop at nothing to defeat his constitutional rights.

87. Wherefore, for the aforementioned illegal conduct, plaintiff seeks $15,000,000 from the defendants for compensatory damages, and $30,000,000 from the defendants for punitive damages.

**COUNT VI**

---

consequence of his persecution by the defendants in this case.
[14] These acts are described in full in case no.: 15-cv-00199-DAF (D. Md.) at docket nos.: 16 & 20.

88. The defendants have at all times since 2001 until present been in an extended conspiracy to deprive plaintiff of his First Amendment & due process rights, his liberty, and his right to his own property, if not other constitutional deprivations.

89. This conspiracy includes a federal judge seeking out with malice aforethought to have a 2001 federal case assigned to him, which he planned, in advance, to sabotage.[15]

90. At least two U.S. judges then actively participated in covering up that criminal act.

91. Those same judges then participated in sabotaging, then helped to 'fire' a sitting U.S. attorney who, in 2004-5, was investigating the alleged crime & its related acts as described in ¶ 89.

92. When a new U.S. attorney was assigned to Maryland in 2006, part of his assignment was to continue to ignore and/or cover-up the aforementioned conspiracy against plaintiff.

93. When plaintiff, years later in 2007, tried to correct the damages resulting from the conspiracy against him by commencing a *pro se* 'attack upon the judgment' of the 2001 case, the same three (3) U.S. judges, at minimum, continuing the conspiracy, thwarted his actions repetitiously.[16]

---

[15] Please see: Case no.: 01-cv-2600-MJG (D. Md.).

[16] Please see: Case nos.: 07-cv-1385-JFM (D. Md.) & 07- cv-1188- WDQ (D. Md.).

94. In the 2009 'Bromwell' case, the USAO MD saw with their own eyes the result of the continuing conspiracy against plaintiff.

95. Yet, no one in the USAO MD would act in any way to see that plaintiff's constitutional rights were enforced.

96. In fact, as described in this lawsuit, the USAO MD, along with other U.S. DOJ agencies, became co-conspirators against plaintiff – switching sides – then siding with the same rogue federal judges whom the former U.S. attorney had previously investigated.

97. The judiciary, the government, and the bar, are supposed to form an adversarial triangle based upon the rules and the law, without which our American judicial system cannot function.

98. The constitutional violations in this conspiracy against plaintiff are far bigger than plaintiff, as they affect every single citizen of the state of Maryland.

99. That not one person in a position of power to help plaintiff would do so is a stain upon the Maryland U.S. Court, the USAO MD, & the Maryland Bar.[17]

---

[17] Plaintiff repeatedly asked both the FBI & the USMS, who seemed, ironically, to be the only entities with any empathy toward plaintiff, to help plaintiff, and to report the clear constitutional violations against plaintiff to their superiors. Nevertheless, it would appear that the **"Brotherhood of the Robe"** is far stronger in Maryland than anyone cares to admit. Please see: Williams-Yulee v. Florida Bar, 575 U.S. ___ (2015); Scalia, J., dissenting, page 13.

100. These intentional, knowing, bad-faith, and illegal acts by the defendants caused plaintiff great worry, anxiety, fear, sleeplessness, etc., amongst many other things, as it was clear to plaintiff that his enemies would stop at nothing to defeat his constitutional rights. In addition, plaintiff has had his reputation absolutely destroyed by the defendants' imperturbable and unconstitutional long term treatment of him.

101. Wherefore, for the aforementioned illegal conduct, plaintiff seeks $75,000,000 from the defendants for compensatory damages, and $150,000,000 from the defendants for punitive damages.

## REQUEST FOR EXPEDITION

Civil rights actions are to be given preference in the Fourth Circuit. Because of the great length of time these matters have continued, the great harm caused plaintiff, and the exigent harm still existing for the general public, plaintiff requests that this court issue an expedited briefing schedule in this case as soon as possible.

## DEMAND FOR A JURY TRIAL

Plaintiff demands that this case be tried before a Jury.

Respectfully submitted,

_____
WILLIAM C. BOND

22

*Pro Se*
P.O. Box 4823
Baltimore, Maryland 21211
(443) 970-2887
proselitigator@aol.com